Mr. Fischer. Mr. Chief Justice, and may it please the Court, the IOIA gives international organizations, quote, the same immunity from suit as is enjoyed by foreign governments. The plain text of this provision, coupled with the structure of the IOIA and the drafting history, make clear that the same immunity from suit as is enjoyed by foreign governments international organizations the same immunity that foreign governments are entitled to today under the Foreign Sovereign Immunity Act. Starting with the text, my opponents do not dispute that as a general rule, when a statutory provision refers to another body of law, especially as here in the present tense, that body of law is incorporated as of the moment of suit in any given case. And, indeed, they don't dispute it. The foreign books that I looked up, I mean, going back forever, don't say quite that. They say that's true as long as the changes are consistent with the purpose of the adopting statute. And, indeed, the Indian case, you know the word was now, was it now 1934 or now later? In the case we wrote last term that Justice Gorsuch wrote, the word was monetary relief. Does that mean as of the past? Or does it mean what we call money relief now? I mean, there are many cases like that. And here the word is is. Does the word is refer to the past? Is at the moment of passage or later? The two arguments that I'd like you to address that are opposite you are, one, States do many things, nations, many, many things. And so if we take immunity from them for commercial things, we leave lots of immunity with them for those other things. But international organizations, some of them do only one thing, lend money or the equivalent. And if we take immunity from them, that's the end of the immunity or close. That's one argument. The second is this. If we decide against you and we've made a mistake or along comes a case where they really should have immunity, the President and the State Department can give it to them. If we decide with you, well, if along comes a case where they should enjoy the immunity, no, nobody can do anything. Did I say that correctly? Have you got the argument? I might have said it backwards. No, no, no. So I think you gave me two things and then one before it, which was the statutory text. Yes, that's right. So let me start with the statutory text, Justice Breyer. And the word is in this Court's jurisprudence always, always means at the time of suit, not at the time the statute was passed. And we've cited reams of cases to that effect. My opponents cite only one case on the other side. That's an Armed Career Criminal Act case. Even there, is didn't mean at the time of suit. It meant at the time of the prior conviction. So is is on our side of this case. In Carcieri, which is the now case, the Indian case, the Court went out of its way in that opinion to say the insertion of the word now takes us out of the ordinary situation, which is when the reference law applies at the time of suit. And so you can look at the Sutherland Treatise, which dates back to 1904 on this principle, and look at it in your own case, Justice Breyer. I think I was going to give you one case. It would be the Steamboat v. Chase case we cite in our reply brief. That's interpreting the Judiciary Act, which goes all the way back to the founding, of course, and says where the common law is competent to give a remedy, such and such a remedy is permissible. And in Steamboat, the Court rejected the exact argument the other side makes here, which is, first of all, that the law had to be incorporated at the time of suit, and second of all, that there was something different about the common law as to a statute at the time of the enactment. So all of the textual stuff is in our favor. Now, you've also asked me two other questions, and let me address them. So starting with the commercial activity exception as applied to a group like the IFC, when you think of that question, it's a question of how close you put the lens into what's going on here. So if you just take a foreign state as the comparator here, a foreign state itself does all kinds of things, like you said, Justice Breyer, that are not commercial activity. But a foreign state might have a bank, for example, that does almost all commercial activity. And so the same thing is true with international organizations, and let me answer that in a few different states. So first of all, look at the sweep of international organizations. Many do things like regulation, for example, managing fisheries. They do things like dispute resolution, law enforcement, Interpol. They do scientific research and agricultural research. All of those things are noncommercial activities on the other side. Then you have the category, the special category of lending banks. But even within lending banks, not all the things that lending banks do are commercial activity. The IFC itself, on its website, talks about how it gives advice to foreign governments about legislation that ought to be passed regulating financial transactions with the private sector. That is not probably commercial activity. And then even within lending activities, Justice Breyer, just take the World Bank. It has five separate institutions. Now, the IFC is on one side. What the IFC does is loan money at market rates for profit for private sector projects. There are other components of the World Bank, and there are other lending institutions that are international organizations, that give grants for public works programs or that do the kind of spending that governments do. And the governments argued in past cases, and we think they're probably right, that that is not commercial activity either. So when the other side says, well, everything is commercial activity, it's no different than the foreign state coming to this and saying, well, if the Bank of Switzerland does commercial activity, then we're stuck. Well, no, no, no. It's just how closely you look at the problem. Breyer. What about the third was if we decide with you, if we decide against you, see, that would mean there is sovereign immunity. But there shouldn't be in a particular case. The State Department can waive it, and they have to be in response. But if we decide for you, and then there's a case where there really shouldn't be sovereign immunity, or rather, rather, there really should be sovereign immunity, see, that's what I'm getting mixed up. You see, if we decide against you, and they really should have sovereign immunity in this case, nobody can do anything. So knowing nothing about the future, it seems a little safer, the first, than the second. Well, I'm going to turn back in a moment to the law and why that just can't fit within the law. But as to just the policy question you're asking me. Even there. Well, if you look at the reason I ask policy questions is because the Hornbook said, yes, apply it as of now, as long as it's consistent with the purpose of the statute. And the purpose of the statute, going back to 1945 and the U.N. and everything, was to get these organizations to locate here. So it's not just policy for policy. It's policy for purpose, and purpose is tied into how you interpret the language. So let me give you the practical answer and then the purpose answer. On the practical answer, organizations, especially if they want a headquarter here, or are headquartered here, are fully able to lobby Congress or the executive branch for special immunity. And there are many examples across international organizations. Take the Organization of American States, OAS, and the Solicitor General discusses this in the organization in its brief. In 1994, it negotiated a special immunity provision for itself to get more than the ordinary restrictive form of immunity that was available under the IOIA. So there are pathways available, and they have been used even more so. Remember, the United States, as you say, has a sometimes principal interest in these organizations, so it is quite responsive to them when they come and say, we need more than the IOIA gives us. But, Justice Breyer, let me turn back to the original purpose, which was the legislative history is quite clear on what the purpose was. As you say, this was partly to create a form of immunity, to give some comfort to these organizations. But the question is, what form of immunity did they ask for and what did they get? What they did is they came to Congress and said, treat us like foreign governments. Give us immunity, as Congress put it in the Senate report, of a governmental nature. And so what did Congress do? It gave them exactly what they asked for. It said, we are going to treat you as a default measure like a foreign government. And remember, the words of the statute are, same immunity, same immunity as is enjoyed by federal government. So we are going to give you the same immunity, subject to the President's ability to adjust it, and subject to your own ability and your own treaty to negotiate for more, and subject, thirdly, to Congress's ability to give you some immunity that you don't have even by way of your own treaty. Can we go to that issue raised in part? The special immunity I know was even negotiated by the UN, I think, in the 1990s, and OAS and others. But assume that we're in your regiment, and Justice Breyer made the assumption that if a lawsuit came to us now under your theory, and it was limited immunity, that the President or Congress could give immunity to the other side. I don't think so. No, it's the opposite. The opposite. The President can't decrease it, correct? Yes. So that problem still remains with your theory. Well, I think it may or may not remain, Justice Sotomayor. That's right. Certainly, we would say we can go forward on this suit because there is no such law. If that law were passed, you'd have two questions. One is, did Congress make it retroactive? And you'd look to Altman to think about how to judge the retroactivity of immunity provisions. And then if it were retroactive, whether that were permissible. But, you know, we're a long way from that sort of a situation. I think the important thing going forward, and this is, I think, what the concern is on the other side, is not so much about this case, but about incentives and policies going forward. They have every opportunity to negotiate in one form or another or to procure a heightened form of immunity. And, Justice Sotomayor, let me say one more thing to you and Justice Breyer about, you know, the idea of the executive branch getting involved. This is one of the problems I submit with the other side's argument. Remember, part of the goal of the FSIA in the first section of the Act, in Section 1602, is to get the executive branch out of the immunity business. Congress made the determination that it was a bad idea to have every case turning on individualized suggestions of immunity and executive branch political policy. And so the other side, by importing the common law of 1945, would reintroduce that problem into international organization immunity in a way that we don't think would be very good politically or very workable in the courts. And I'd hasten to add that even under the rule of 1945, if the question were, what does the executive branch think about any given lawsuit or any given immunity for any given type of suit, that would just lead you right back to the FSIA. And it would lead you back to the same conclusion that we submit to you here. So either pathway, whether, Justice Breyer, you start with the way you've always looked at cases with the word is and the word same and the reference canon that I've described and say, all of those things lead you to a time of suit rule. Or if you start with the law of 1945 and say, what was the law of 1945? Well, Hoffman and Ex Parte Peru were clear that the law of 1945 was the executive branch decides, and it's not for the court. This is, I'm going to give you the court's own language. It's not for the court to give immunity where the executive branch has not seen fit to give it. And if that were the test, you'd come right back to where you, where I started here, which is that the FSIA would control, or at the bare minimum, the executive branch position in this lawsuit on the type of immunity that ought to apply in this situation would control. So Mr. Pizzo. Roberts, I can pick up on Justice Breyer's question. The reference canon, I take all of your points, but sometimes, let's say we have a statute that refers to another statute. Usually, we would look at the second statute that's being incorporated as of the time of the adoption of the first statute, right? So if this statute were to say, go look at Section 5, we wouldn't look at it the way it's been subsequently amended. We'd look at it as it was originally enacted in 1945. Why isn't that idea pertinent here? You know, when we refer to a specific law, we don't take it to evolve over time. So for two reasons, Justice Gorsuch, and one of them, you'll forgive me, is going to be something you said in the El Encanto opinion. I was afraid of that. But for two reasons. One is Congress has a choice to make when it writes legislation. It can lock in a given rule by setting a specific statutory provision and says that's the rule we want. Just like if Congress uses a particular word, the time of the enactment, the meaning of that word at the time of enactment would be what Congress, we'd assume Congress wanted. Or Congress can do something different, which is to say, look, we're not sure exactly the meets and bounds of the law. We're just going to tie it to this other area of law as a general matter. And that's what Congress did here. It did the latter. So it took an area of law as a point of reference and said just use that as the default rule and then adjust as necessary. And those are just two different pathways Congress can go down, and they date, as I said, all the way back to the first Judiciary Act, they're in the Sutherland Treatise, all the way back to 1904. And so there's just two different pathways Congress can go down. And it makes perfect sense, I think, in a situation like this, especially where you have a common law doctrine being referenced, at least a common law at the time, and one that was indeed not just any old common law doctrine, but one that was in a great deal of flux at the time. So it made every reason, it made every good reason for Congress to have a general reference, not a specific one. And then the second reason, Justice Gorsuch, is the one you mentioned sitting on the It becomes all the more stilted or antiquated or even foolish sometimes to try to answer questions in the modern day according to what some bygone-era doctrine would have required, and especially a bygone-era doctrine like this. If I understand the other side's position correctly, basically the question they're having, they would want every Federal court to ask in these cases is, what would the Truman Administration State Department have wanted to do in this case? And when you have things like this, which didn't even, or an organization that didn't even exist at the time, sometimes doing activities that weren't even contemplated at the time, things like sovereign wealth funds, which foreign sovereigns now engage in, for example, who knows what the State Department would have thought then? I think there's every reason then to fall back on the reference canon. And if I could say one more thing before reserving my time, if you have any doubt about just the plain text argument I've given you, I would urge you to compare the text in Section 288A to the section 288D, which has the exact dichotomy that I've been discussing today. One subsection, subsection A, says that the same immunity rules apply, and subsection B says that foreign officials, I'm sorry, international organization officials are entitled to absolute immunity. So this is yet another reason why, if the other side were correct, and if Congress had wanted to lay down the rule they did, why would they not have just used the absolute immunity language in subsection B of subsection D, and that indeed was the original draft of this Act that was discarded? So I could go on, but I'd rather save the rest of my time for rebuttal. Thank you, counsel. Mr. Ellis. Mr. Chief Justice, and may it please the Court. If I could, I'd just like to pick up right where my friend left off. There's been a lot of discussion so far this morning on the text of Section 288A. We agree that Petitioners have the far better reading of that phrase in isolation, but I think it really settles the deal when you look at the entire structure of the Act. The IOIA doesn't just grant immunity in Section 288A.B., but it provides a whole host of immunities, and it does it in two different ways. In several different provisions, the Act sets a fixed rule of immunity. So archives are inviolable, and officers and employees of the organizations are immune from suit with respect to their official acts. And then there are a host, a collection of three provisions that set the immunity by reference to foreign governments. There's Section 288A.D., Section 288D.A., and there's Section 288A.B., the one at issue here. Respondents concede that the referential language in those other two provisions do refer to the state of the law as it is today. It's only the one that's at issue in this case that they say was frozen. We don't see how that can be, and that's particularly true when you look at the drafting history that my friend referred to. Ms. Torellis, before you get to that, another part of the structure is this provision that deals with presidential authority, and that's essentially a rollback authority of immunity. And doesn't that make a lot more sense, that provision, if you assume that Congress meant for there to be absolute immunity? In other words, the presidential authority is a one-way ratchet. The president can only, under this provision, roll it back. It can't increase it. So to me, if I – if the immunity is less than absolute, you would think that they would have given the presidential authority both ways. Sure. The reason that argument doesn't work is because Section 288, the president's authority under that provision, doesn't just apply to Section 288A.B. It applies to all of the immunities provided by the IOIA. And as I was just describing, some of those are fixed immunity rules that are not absolute. And so, for instance, the officers and employees of international organizations do not receive diplomatic immunity. That was a big deal at the time. And yet, the president can't – couldn't ramp that up. I think what that provision shows is that Congress wanted to provide international organizations at most the immunity from suit and other privileges and immunities that foreign governments received, and not more so. And yet, Respondents are here today asking you for exactly that, more immunity than foreign governments receive. Breyer. Look, whatever other things it refers to, the provision allows the president to waive immunity, not to grant immunity. And your argument is they have immunity, right? No, I haven't – I get this backwards. This is the third time I've got it backwards. Sorry. The provision allows the person to be sued. Is that right? It does allow to be – Okay. So I was right. I had it backwards the first time, but not the second, not the third. All right. It allows the president to waive the immunity. That's right. Okay. It doesn't allow him to grant the immunity. It doesn't. But the power to waive the immunity, at least in this section, amounts to nothing if they have no immunity because, for example, all they do is lend money. So a couple – That's – and the other way, it seems to work itself out. Understood. A couple of responses to that. That's the question, I think. Glad to be able to address that. Number one, just to be clear, they do have a great deal of immunity. I mean, international organizations and foreign states are presumptively immune. And I would agree with almost everything that – maybe everything that my friend said about why the commercial activity exception, even with regard to IFC and most – more going to eliminate immunity. I would add one more, is that even a case like this, we have serious doubts. And we think, in fact, from what we know, this suit isn't going to be able to go forward regardless of the answer to the question presented. Because in addition to having – to being connected in some way to commercial activity, there must be a much stronger nexus. It must be based on commercial activity that occurs in the United States. We think the Court's decision in OBB makes clear that the way you apply that is to ask, what's the gravamen of this suit? It's not enough to have some attenuated connection, but what's the gravamen? And the gravamen of this suit, as we understand it, is torturous conduct that occurred in India, injuries that occurred in India. And we don't think – we have serious doubts that this is going to be able to go forward even under restrictive immunity. And so we do not think that what we're doing is opening the floodgates here. Rather, the sort of concerns that would be barred – cases that would be barred by Respondent's absolute rule of immunity and would be allowed by ours are sort of quintessential domestic disputes, contract disputes with your contractor who renovated the building, the slip and fall at the – at the organization's headquarters or the driving accident on the streets of New York in D.C. Do you have – do you have any idea about how many of these kinds of organizations are headquartered in the United States? I think the numbers are in the 20 to 30 range. There's about somewhere 80-some organizations that have been designated for protections under the IOIA and 20-some that have – I think are headquartered in the United States. That are commercial? No, no, no, I – no, I did not – no. We're – everybody's assuming a floodgate. Sure. No. There are – there are a number of development banks, but even – even the development banks. If you talk about the World Bank, it's not clear that those commercial activities are the sorts that the FSIA captures with the commercial activity exception. Lending there is to sovereign governments. And as a court has been – as lower courts have explained, that sort of commercial activity is not the sort that a private party could engage in. So it's not the sort that the commercial activity exception picks up. Well, I have the IFC, the IMF, the World Bank, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the International Development Association. I have that – that's only half of them. Sure. That's – I'm not sure what percentage of that is. I want to point out that some of those organizations have their own immunity provision in their charter. And so that's what we think – if you look at the history, that's what – that's been dealt with for organizations that require absolute immunity. We've entered into agreements. I would point again to the OAS agreement, where the State Department is just crystal clear that what OAS did in that agreement was to negotiate absolute immunity because they thought that's what they needed in order to put their headquarter here. We agreed to that, and we said, but hey, this is not our usual practice. Ordinarily, we afford only restrictive immunity. And we pointed to the FSIA. Mr. Rose, I guess I'm not sure I quite understood what you meant. As to the core lending activities of these multinational development banks – in other words, making loans where private actors would not make loans – do you have a view as to whether that counts as a commercial activity or not? Did you say that that would not count as a commercial activity because they're making loans that the private market would not make? No, I'm not saying that it's enough, that they're making loans that a private – they provide. I'm saying if the nature of the loan is such that it's not the sort of a transaction that a private party would enter into – so think about the IMF that grants – that lends to sovereigns, and they do so on the requirement that the sovereign enact certain regulations and change their laws in order to assure that they won't need the money again. That is the sort of thing that's been held by lower courts, and we've advocated is not a commercial activity. That's just not the sort of transaction that a private party can enter into. It's not just that a private party didn't. It's that no one – that's not something that you can do. That's a sovereign act. Can you give me anything to assure me? Because when I look through this list, I thought that there are development banks like the World Bank, which is a pretty big deal, as well as in Asia, in Africa, we're trying to encourage development all over the world, and suddenly by removing the sovereign immunity because the plaintiff will claim this is a commercial activity, and you're not denying it. And so what is the assurance that the government can give us that this isn't going to lead to a lot of lawsuits, and this isn't going to interfere with perhaps activity that the United States traditionally has been very much in favor of? Absolutely. Let me give you a couple of things. I think we've given you a number of points already this morning as to why we don't think the floodgates are going to open. If there's one other, I'll say that just look at the charter of these organizations. Look at the IFC's charter. They already waive suit – waive immunity for suits going directly to their core activities. They, in fact, indicate that they need to waive suit in these suits. And so I think when you're talking about what are the suits that are going to come up under commercial activity, many of them are already going forward because the IFC and the World Bank and others have waived their immunity. And they need to because? They need to because no one's going to enter into a financial transaction with them if they know they can't sue if it goes south. The other thing, I want to also focus the court on the suits that we know are not going to go forward on the absolute immunity side. We're talking about suits by U.S. citizens and residents about domestic conduct, and they're seeking redress in U.S. courts. These are the suits that foreign governments are able to be sued of and don't have immunity, and we don't see any reason why international organizations should not also be subject to suit in those circumstances. And we think that's exactly what the Congress was trying to do when it enacted Section 288 in 1945. If there are no further questions, we'd ask the Court to reverse. Roberts. Thank you, counsel. Mr. Verrilli. Thank you, Mr. Chief Justice, and may it please the Court. The IOIA prescribes a standard of virtual absolute immunity that is fixed and not evolving. We know that because the text incorporated common law terms that had a settled meaning of virtually absolute immunity and because a fixed standard makes the most sense in light of the statutory context and purpose. Now, the reason that Congress enacted the IOIA was to fulfill treaty obligations that committed us to provide virtually absolute immunity. Those treaty obligations did not commit us to treat international organizations the same as foreign states were treated. They committed us to the substantive standard of virtually absolute immunity. And therefore, if the language in Section 288a)(b is interpreted in the way my friends on the other side suggest. Sotomayor So why didn't Congress say that the way it did in the other provisions of this Act? And if it intended that in no change, it could have said it and given the very exception it gave, which is that the President or the Executive could reduce immunity, which was the standard at the time. Verrilli, So let me start with a basic question. We think if the Court applies the normal rules of construction that it applies in statutory interpretation cases, that Congress did say that it was providing virtually absolute immunity. And the case in particular that I would point the Court to is the Nader decision, 527 U.S., and in particular to page 21 of the Nader decision. That's a case of course was about whether mail fraud and wire fraud incorporated a materiality standard. This is an opinion by Chief Justice Rehnquist, unanimous for the Court on this point. The Court said first we look to the text, of course, and looking to the text, if we look to the text, based solely on a natural reading of the full text, materiality wouldn't be an element of the fraud statute. And then the Court says, but that does not end the inquiry, because in interpreting statutory language, there's a necessary second step, and this is coming to the point that I think governs here, which is that it is a well-established rule of construction, a rule of construction, that where Congress uses terms that have accumulated settled meaning under the common law, a court must infer, must infer, unless the statute dictates otherwise, that Congress means to incorporate the established meaning of those terms. Now, the Foxx. Ginsburg. What about the argument that there wasn't an established meaning in, what was it, 1945, that the status of the immunity was in flux? It had been absolute, but then we were going over, the State Department was advising the Court whether immunity should be given in a particular case. There's a bit of a suggestion to that effect in the brief in the United States, Your Honor, but I would respectfully suggest that is not a fair characterization of where things stood in 1945 at all. It is true that some people within the State Department in 1945 thought that immunity should move to a more restrictive standard, but the Justice Department would not even advance that standard in this Court at the request of the State Department, and this Court did not describe the immunity as being in flux. This Court said the standard was virtually absolute immunity. If one looks even in 1952 at the Tate letter, the Tate letter didn't say the law was in flux in the United States. It said the United States was hewing to the standard of virtually absolute immunity, but other countries were moving towards the standard of restrictive immunity, and therefore we ought to reconsider what we're doing. So I just — I mean, the Court can read these materials for itself, but I just respectfully do not think it's a fair consideration of where things stood in 1945 at all. And then, what I could — I'd like to pick up on a related point that came up in the brief of the United States. It's another statement in the brief of the United States, and it came up in an argument today that, look, this really isn't a problem because for those organizations that need immunity that goes beyond the restrictive immunity, we've always understood that they get — they can go get a special statute, and they've gone and gotten special statutes. The United States says on page 27 of its brief, precisely because the IOIA didn't provide that level of immunity. They give these three examples, IMF, World Trade Organization, and Organization of American States. I'd like to take a minute and go through each of them because it doesn't hold up with respect to each of them. With respect to the IMF, for example, it is true, the IMF, you know, it has a treaty. There was a statute that gave that treaty effect under U.S. law, which ended up providing for absolute immunity. But it can't possibly be that that was undertaken based on any sense that the IOIA didn't provide that level of immunity because the IMF statute was enacted in July of 1945, and the IOIA wasn't enacted until five months later. So it can't possibly substantiate what the government was saying. If one looks at the WTO treaty, it is true with respect to that treaty that it committed us to a very wide scope of immunities. It said that the United States will commit to providing all or virtually all of the immunities provided under a whole different U.N. convention, the U.N. Convention on Specialized Agencies. Now, that convention has all kinds of tax immunities and property immunities that go way beyond what the IOIA provides. So, of course, they needed another statute in order to make those treaty commitments. That doesn't prove anything about whether anybody thought that the IOIA failed to provide virtually absolute immunity. In fact, the historical evidence, I think, really, to the extent it points in any direction, it points very much more in our direction. And the best way to see that is with respect to the way the United Nations was treated under by the executive branch in this country. Now, we signed the U.N. Charter in 1945, committed us to provide what the charter describes as the necessary immunities. Then the U.N. Convention on Immunities was negotiated in 1946, which said that the U.N. should get virtually absolute immunity, not the same immunity as foreign states, virtually absolute immunity. Now, the United States did not ratify that convention until 1970. So on the theory that my friends on the other side have, from the moment of the Tate letter in 1952, when foreign state immunity became restrictive and not virtually absolute anymore, we were in violation of the commitment we made in the U.N. Charter. Now, if that was true, you would certainly expect the State Department, A, to address it in the Tate letter, but there's nothing in there. It's a classic case of the dog that didn't bark. And, B, you would expect them to try to do something about it, like get the U.N. Convention ratified immediately, because otherwise we're going to be out of compliance with our obligations to the granddaddy of all international organizations, the United Nations. But there's not a ---- from 1952 until the ratification of the convention in 1970, you can't find one word by anybody in the executive branch ever saying that. What you do find is ---- Sotomayor's Commercial activities was the U.N. doing at that time. I know today it's a very different organization, but it's not clear to me that there was much going on that was commercial at its initial stages. Verrilli, I take that point, Your Honor, but what I would say in response is that there was a very great deal of sensitivity about the whole package of immunities that were available to the U.N. and its diplomats and its workers. And there was concern all along from 1952 to 1970 that the ---- where the executive was urging Congress to ratify the convention, but the only things ever mentioned were the immunities for diplomatic individuals. And then when you get to 1970 and you actually look at the Senate report accompanying the ratification, this was not in our brief, but it's at page 31 of the brief of the scholars who filed the brief in support of us, it quotes the Senate report from 1970. And what the Senate report says is we're not granting the U.N. any ---- the U.N. as an organization any immunity it didn't already have under the IOIA. So as late as 1970, it was just quite clear that everybody understood the IOIA conferred virtually absolute immunity, and of course, that's because it was enacted to comply with our treaty obligations. It wasn't enacted to make sure that come what may, that international organizations would get treated the same as foreign States. That is, you know, that's the best way to think about it, is it's just a completely anachronistic way of thinking about the body of materials in front of you. Kagan. But even what you just said, Mr. Varelli, it wasn't enacted to make sure that foreign organizations would get treated the same as foreign States. I mean, that's exactly what the language of the thing says. Verrilli, I guess a couple of things about that. I think the right way to think about the language, Justice Kagan, is that it was a means to an end in 1945 when it was enacted. It was not the end in itself to assure equivalence of treatment come what may. It was the means by which Congress ensured that it would fulfill its treaty commitments, which were to provide virtually absolute immunity. And we know, the Senate report says, we're enacting this provision to fulfill our treaty commitments, and our treaty commitments, again, were not to treat them the same. They were to provide virtually absolute immunity. Kagan. Do you think it was – you answered Justice Ginsburg's questions about how far we were from the Tate letter in 1945. But do you think it was inconceivable to Congress that the common law of immunity would change? Verrilli, I can't say that it would be inconceivable to anybody. But what I can say is if one looks at the debates surrounding the passage of the IOIA, is once again, it's a dog that didn't bark. You can't find a single person anywhere saying anything remotely like the proposition that we need to adopt a standard that will evolve over time because we have a concern that foreign sovereign immunity law will evolve over time. It just was not any part of anybody's thinking at the time. They were trying – you have to remember, this is coming out of the Bretton Woods system. We have Bretton Woods. We set up all these organizations.  There's a lot of pressure on Congress to get these organizations up and going and give them the immunity we promised them so they can go out and do their work. That's what led to the enactment of the IOIA. It was none of these other things. As I said, I really think if you look at the historical materials, the gloss that my friends on the other side are trying to put on it is completely anachronistic. They're taking a different concept that they've come up with now and trying to retrofit the historical facts to match it, and it just isn't right. Breyer. Is that – the Russians at that time, 45 and so forth, that were putting all these businesses into State entities, so my guess is there were a number of cases, and what I thought I heard Mr. Fisher say is if we really go back and look at this, we'll see that the status quo before this passed was not absolute immunity, but the status quo was a kind of mess where sometimes the State Department would say give them immunity and sometimes the State Department would say not. Now, what is the actual situation as far as you've been able to find it? I don't – with respect to my friends on the other side, I don't think that's a fair characterization of the historical materials. Ginsburg. That's the same – the answer you gave to me is the answer you would give to Justice Breyer. Breyer. Yes. Same question. Yes. I mean, it's just not there. I mean, look at what this Court's cases said. This Court's cases didn't say anything like that. The government's briefs to this Court didn't say anything like that. When this Court has looked back on the law in Verlinden and in Samantar, it hasn't said anything like that. It said the standard was a common law standard of virtually absolute immunity. And that's, in fact, how the Tate letter describes it, too. And that is a process of entry. Scalia. Oh, I got it. My friends on the other side have made this argument that, well, our position would also require you to go back to the process of the State Department making an ad hoc case-by-case determination, but that's wrong, too. And that's clear on the face of the statute that it's wrong, and the – and that's right in Section 288. This creates an entirely different mechanism. What the – what the IOIA says is that the President shall have the authority under an executive order, once Congress has enacted a statute, to grant an international organization the privileges and immunities. And if you look at the face of the statute, it's obvious that they are granted on a categorical basis in gross by an executive order, not on a case-by-case basis by the State Department when a lawsuit is – when a lawsuit is filed. And then, similarly, in terms of the President's authority, an executive order to reduce or eliminate the – the immunity of an international organization, that it's – again, it's completely different than the situation that – than the common law process that works. So obviously, Congress made a judgment that it was going to put a different structure and system in place. And the fact that Congress did that, I do say, I do think, quite clearly presupposes that there's the existence of a substantive standard being prescribed. And the substantive standard, as I said, is virtually absolute immunity. And then in terms of the structural indicators in the statutory text, going back to a question you asked, Justice Sotomayor, I really think the most telling one, to show you, I think, why my friends on the other side's case is completely anachronistic and where correct is Section 288F, which you can find at page 6A of the appendix to the blue brief. That provision says that the privileges, exemptions, and immunities of international organizations and then of members, employees, et cetera, shall be granted, notwithstanding the fact that similar privileges, exemptions, and immunities granted to a foreign government, et cetera, et cetera, may be conditioned upon the existence of reciprocity by that foreign government. So right there in the text, it decouples the treatment of international organizations from the treatment of foreign states, even in a situation in which the United States would not grant the full range of virtually absolute immunity because it wasn't receiving reciprocal treatment. This statute says the international organization gets it. So the statute says that the international organization gets it. Ginsburg. How do you deal with the argument that we just heard, that we can compare 288A on the one hand, which keeps the international organizations in tune with foreign sovereigns, and 288, was it B and D? Verrilli, Yes. I do think that the differences break down into two categories, Your Honor. Some of the provisions do prescribe fixed standards. That's true. But those fixed standards, as we explained in our brief, or at least tried to, are always situations in which the IOIA is conferring a narrower set of immunities on diplomats and individuals than the common law would have at the time. So incorporation of the standard in the way that 288A, B did wouldn't accomplish the objective there, because there was — they were quite consciously trying to narrow the overall scope of immunities and not give the individuals who worked at these organizations the same full treatment that diplomats got from foreign states. Now, the second subcategory are the provisions where the statute says that the treatment shall be the same. But there's two things about that that are significant. One is it says they shall be the same as under another statutory provision. And as we said, we think that's vitally important here. We think it's quite clear that in addition to Justice Breyer's points about the reference canon, that the reference canon applies when one statute incorporates another. It doesn't apply when one statute incorporates the common law. And here they were incorporating statutes. And if you look at those provisions anyway, they're basically just instructions to the executive branch. When do you fingerprint the people when they're coming in? What do you do about that — this detail or that detail? They don't go to the heart of the matter at all. And the heart of the matter here is the immunity being conferred on these international organizations. I just want to make a point about that, and then, if I could, talk about the consequences that will ensue, I think, if we go down the path my friends on the other side are suggesting. And I think this is a critical point. I just want to make sure it's clear. Another reason why you shouldn't draw this equivalence, and we can't be that Congress really intended to draw the equivalence between foreign States and international organizations such that they would just move in tandem no matter what, is that immunity is granted for different reasons. The reason you give an international organization immunity is a functional reason, not a status reason. It's not about according the appropriate respect to the sovereigns, because international organizations aren't sovereigns. They're separate juridical persons. And what's quite clear, it's clear from the San Francisco report on the foundation of the U.N., it's clear from the Senate report in 1945, it's clear from all the commentators that we've discussed in our brief, it's clear from the restatement of foreign relations, which we've cited in our brief, that you grant immunity to international organizations so that they can carry out their functions effectively. And just take let me take a minute and kind of elaborate that, because I think it's  Remember, these are the kinds of things that we're talking about. Roberts. You don't mind, I'm afraid I'm about five minutes behind you here, but going back to your point on 288F, you said it's there, they're decoupling the international organizations and the foreign sovereigns. But as I go back and read it, it's simply because the foreign sovereigns have the capability to use reciprocity, and the foreign and the multi-country organizations do not. I don't, I mean, that's the difference they're drawing there, not something between the scope of the actual immunities. Well, I, the way I read it, Mr. Chief Justice, is what they're doing there is saying even in a situation in which the United States concludes that it won't afford a foreign sovereign the full virtually absolute immunity because of reciprocity, in other words, we're not getting it back from them, and even in that situation, an international organization of where those sovereigns are members will still receive the full level of immunity. And so I think what that tells us is that what Congress was trying to do in this statute overall was prescribe a fixed substantive standard, not a floating standard where the two things move in tandem. And I do think it supports that. And if I could just go back to the functional point. Remember, these are collective bodies. The members come together. They make, they take resources from each of their own countries. They put them in to these organizations. They make collective decisions about how to deploy those resources. And the point of the immunity here is so that the courts of any country, but especially the host country, which for the most important organizations is going to be here in the United States, can't override the collective judgments that they make about how their resources should be deployed and what conditions they ought to impose, et cetera, by the intervention of domestic law in U.S. courts, and can't redirect the funds that are put into these organizations to pay massive class action tort judgments. Because, of course, the member countries are contributing this money because they believe it's going to be put to the use of the, for example, the development bank that the development bank decides it should be put to, not to pay massive tort judgments. And I think in one place you see this very clearly. If you look at the report of the San Francisco conference about the founding of the U.N., the State Department's response coming out, report coming out of that conference specifically says this. It says, of course, the United Nations can't be subject to the jurisdiction of any one State or its courts. And it's for exactly this reason. And the same thing is true generally. That's why you give it, not for functional reasons. I mean, excuse me, not for reasons of status, but for functional reasons. And I think another key reason why you shouldn't be thinking about this as a standard that evolves, evolves downward over time, is that those functional reasons don't evolve downward over time. Roberts. Well, what about the point that most of the concerns you have are going to be dealt with by the requirement of a nexus to activity in the United States as opposed to simply abroad where the projects are funded? Verrilli, Jr. Yes. I was gratified to hear the United States say that.  I think what essentially the United States is saying here is, look, the statute leaves one with no choice but to apply restrictive principles of immunity. You've got to jump off that cliff. But don't worry, it will be a soft landing, because the FSIA will take care of a lot of these problems. And I guess what I would say about that is, in the unlikely event you don't agree with me, I hope they're right. But there's no guarantee that they're right. Breyer. Are the lending decisions, which may be fairly detailed and may include dozens of conditions, made within the United States? Well, yes, I think that's a big part of the problem. Is there or are there lawsuits that could say that there was negligence in determining in a different country who the persons were or the conditions under which the money would be spent? Is that an American lawsuit? Saying what you've done here is commit the act of negligence or failure to be a fiduciary here. That's this lawsuit. That's this lawsuit, Justice Breyer. That's exactly what they're alleging. Well, but I mean, is that consistent with our opinion in the OBB case, which I think if the complaint is based, the gravamen of the complaint, not specific steps along the way? I mean, that was the issue we dealt with in that case. And I appreciate the fact that it's, you know, to some extent dependent on the facts and particular allegations. But it would seem to me to require a lot more than simply the specific decisions. And the gravamen, where's the gravamen or gravamen, however you say, what's going on here? Well, we would certainly say it's India, of course. And if we have to defend ourselves on that basis, we will. But I think it understates the real concrete risk here. And what I'd like to do to illustrate that, if I could, is first talk about the organizations that are going to be exposed in a way that they wouldn't be under the law. And Justice Breyer indicated earlier, it's important to remember, this has been the law in the D.C. Circuit for decades. And people have ordered their affairs based on the assumption that there was virtually absolute immunity. But with respect to the consequences and the groups affected and then the types of effects, with respect to the groups affected, you've got entities like us, the multilateral development banks. Justice Breyer has identified many of them. Now, the main ones are here, here in Washington, D.C., and they're making their decisions here, and I think critically, too. There are billions of dollars of assets here. Now, we're going to make the OBB argument for sure, and I hope we win, if we have to make the argument. I hope we win. But who knows how courts are going to come out on that issue. We're going to have a lot of fighting about that. There are probably going to be matters of degree. There are certainly going to be significant disincentives arising out of that uncertainty. There's a whole other group of entities that, unlike the banks, at least have articles of agreement where we can try and fall back on those for alternative arguments of immunity, where their immunity depends entirely on the statutory grant, the International Committee of the Red Cross, the World Health Organization, the fund to fight, the global fund to fight AIDS and tuberculosis and malaria. They're all entirely dependent on the IOIA for their immunities, and those immunities are drastically different after this. And then we do have the issue, I think, with some organizations that we may even actually now be out of our compliance with our treaty commitments. And what's going to happen, here's what I think is going to happen. And I think this lawsuit helps you see it. Now, the way the basis of this lawsuit is the following. The IFC, when it loans money here, it's loaning money in parts of the world where private capital won't go unless we go in there. And very often they've undeveloped legal systems, and they certainly don't have robust environmental protections or labor protections. So what the IFC has done is lean into those and put those kinds of environmental standards and labor standards into its agreements, saying you want this money to do this development project. These are the standards that you've got to live up to. And this lawsuit is that the entity that we loaned this money to didn't live up to the standards, and it's our fault. And so we're being sued here. Well, it's going to create, if that kind of a suit can go forward, and hopefully it won't be able to, Mr. Chief Justice, but if it can, it's certainly going to create an extraordinary disincentive for organizations like ours to lean into those kinds of standards because we're going to be hoist by our own petard. Then we've also got a robust internal accountability mechanism where if people think something's gone wrong in one of our projects, they can come to us, and they can say, look, there's a problem here, and we investigate, we take internal remedial measures if we find there's a problem. Well, you know, the factual basis for the lawsuit is the report of our internal accountability process. So if they can just grab that and take it into court and make it the basis for a class action tort lawsuit in which they can make a claim for all this money, it's going to create a powerful disincentive for us not to engage in that kind of self-policing activity. And I would submit that, you know, even if things ultimately work themselves out under the FSIA, I hope we don't have to deal with that, but even if we do, it's going to take a very long time. There are going to be a lot of difficult cases at the margin. There are going to be very serious disincentives immediately. And conversely, you know, we're a big, fat target here. These organizations have lots of money, and of course foreign plaintiffs want to sue here. They can bring a class action. They get liberal discovery. They can get punitive damages, get all of these advantages by suing here. So instead of suing the person who actually injured them, the power plane in India, they come here and sue us. And I really think what you're going to see here is that this is just going to become another version of the sorts of foreign-cubed lawsuits that the Court has been concerned about under the Alien Tort Statute, where the international organization is just going to be subbed in for the foreign defendant, and it's going to be subbed in in a situation where we have a very significant pile of money. And if I could just close with this thought, and I'm just going to pick up on Justice Breyer's thought. The law in the District of Columbia, where virtually all these organizations have been housed or headquartered, has been virtually absent of immunity under D.C. Circuit law for decades. That's the standard everybody's been operating on. Nobody has suggested that anything has gone wrong under this statute, that there are any deleterious policy consequences, that the interests of the United States are adversely affected in any way. In fact, if you look at the amicus brief from the former Secretaries of Treasury and State, they think that the policy the government is arguing now is going to disrupt the United States' ability to function effectively with these organizations. It's all been fine, but they're asking you, essentially, to repeat a metaphor used before, to jump off a cliff. And hopefully it will be a soft landing, but we don't know that, and it could easily result in a lot of disruption to the good work that these organizations do. And I guess what I would suggest is that if that's going to happen, it ought to happen through legislation. Congress can look at this. Congress can change the law if it wants to. But this has been the law for a very long time. There's no evidence that it has done anything other than work well, and therefore I think the Court should affirm the D.C. Circuit. Thank you. Roberts. Thank you, counsel. Four minutes, Mr. Fisher. Fisher. Fisher. Thank you. I'd like to make four points, and I'd like to start with the text of the statute itself and simply say, when Mr. Verrilli talks about the Nieder doctrine and the common law doctrine that you look at the term --"a term's meaning at the time of enactment," he's mixing apples and oranges. And I think all the citations in our reply brief should make it absolutely clear that there's a doctrine on the one hand that talks about incorporating a body of law, and there's a doctrine on the other hand about giving meaning to a specific term. We're in the former camp here. And as to the point about whether the common law was evolving at the time, two things will stand on the papers as to the fact that it was somewhat in flux. But the more important point is, even if it weren't in flux, it wouldn't matter one whit, because the other side is making a sweeping proposition, which is any general reference to common law is fixed in time. That would disrupt any number of federal statutory regimes from the Federal Tort Claims Act enacted the year after this statute, Equal Access to Justice Act, the Federal Government's Piracy Statute, Federal Rule of Evidence 501. I could go on and on with federal statutory regimes that reference the common law in exactly the same way the statute does here, the Civil Rights Act of 1866, if you want one more. All of those would come out the other way from this Court's jurisprudence and from all the understanding if the other side is right about statutory interpretation. So I think the only thing the other side has is they have a bunch of policy points to make for this Court. Now, we don't think they should control, but let me answer them. So first, as to our treaty obligations. So one about at the moment of enactment, my friend kept saying that there were various agreements in place that required virtually absolute immunity. None of the agreements used those words. Instead, what those agreements said is that certain organizations were entitled to immunity to allow them to perform their necessary functions. That's a very different thing than absolute immunity, and it's very different because none of the organizations involved were performing, Justice Sotomayor, commercial activities that were essential to their core functions, not the U.N., not any of the other organizations. So we weren't in breach of any treaty rights, and if you have any doubt on that, I would urge you to look to the federal government's position then and now. It's not just a brief filed in this Court. It is the position that four different presidential administrations have taken, the Carter administration right after the FSIA was passed, the George H.W. Bush administration, the Clinton administration, and now the Trump administration have all consistently held that the FSIA rules are incorporated into the FSIA. Next, on the floodgates concern, I explained earlier, and I hope you'll think about the fact that while the core activities of the IFC might be commercial activity, not all of the IFC's activities are, and certainly not all the activities of international organizations are. But let me add one more thing. My friend talked about big lawsuits of ruinous liability. Well, there's two very easy ways to control that. One is, to the extent any claims are on contracts, they can write their own contracts and negotiate their own contracts. As the Solicitor General points out, they can even deal with third-party beneficiaries in their contracts if they choose. Secondly, as to tort claims, they can, and in fact commonly do, indemnify themselves against tort lawsuits. In this very case, their agreement indemnifies them against any judgment and all legal fees. So these organizations have every manner of method to deal with any potential liability. And in fact, they are, which sort of belies the suggestion that they think they're absolutely immune from lawsuit. Finally, let me say one thing about the so-called four-and-cubed problem, or the facts of this case. Now, obviously, we think that we would satisfy the Grovman test. They have never made that argument, and if they want to make it, we can have that conversation in the lower courts. But bear in mind what you're being asked to do in this case is to announce a categorical rule for all cases dealing with international organizations. So my friend in the Solicitor General's office talked about just regular tort slip-and-fall cases and the like in the United States. Let me give you one other thing to think about. Some international organizations actually do their work in the United States. The Border Cooperation — the Border Environmental Cooperation Commission does wastewater treatment plants in Texas and California. I can't think of any reason why they would be immune from those infrastructure projects in a way that no private business or public government would be. Roberts. Thank you, counsel. The case is submitted.